McCarter, Atty.-Gen., *v.* Lehigh Valley R. R. Co. 78 *Eq.*

ROBERT H. McCARTER, attorney-general,

*v.*

LEHIGH VALLEY RAILROAD COMPANY et al.

[Decided February 21st, 1911.]

1. A grant by the legislature by *P. L. 1867 p. 251* to a corporation incorporated under act December 31st, 1824, creating a canal corporation, of a basin adjacent to the terminus of its canal in the Hudson river, is not within *P. L. 1869 p. 1017* authorizing riparian commissioners to grant lands under water to grantees having prior legislative grants, and thereby curing defective grants.

2. A conveyance by riparian commissioners under *P. L. 1869 p. 1017* providing that a conveyance shall not merely pass the title to the land described but the right of the grantee to exclude to the exterior bulkhead line the tidewater by filling in or otherwise improving the same and to appropriate the land to exclusive private use, acquires a personal right to appropriate the land granted to any use he may see proper.

3. A general affirmative statute does not repeal a prior particular one unless there is such an irreconcilable inconsistency between them as indicates an intention to repeal.

4. *P. L. 1871 p. 444*, authorizing a canal corporation created by act December 31st, 1824, to lease its canal or any part thereof with appurtenances and franchises either "perpetually" or for such shorter time as may be agreed on between the parties, merely authorizes the corporation to lease its property for a term not exceeding the period fixed for its existence, the word "perpetually" not giving the corporation any property or franchise that it did not previously have.

5. The state is not presumed to have parted with any of its property in the absence of conclusive proof of an intention to do so, and any ambiguity operates against the grantee and in favor of the public.

6. A grantee under a conveyance by the riparian commissioners under *P. L. 1869 p. 1017* authorizing conveyances to grantees having prior legislative grants, &c., may not rely on *P. L. 1874 p. 103* empowering the riparian commissioners to make conveyances, the grantee applying for the grant in the manner prescribed by the act of 1869 and the commissioners acting under that act.

7. Ordinarily a court of chancery has no jurisdiction to pass on legal titles.

8. The court of chancery, in a proceeding by the attorney-general under *P. L. 1907 p. 96* to determine title to riparian lands in which the state claims an estate, must determine the legal question according to legal rules.

9. Where the state could not bring an action at law to test the legal title to land, and it could not sue in equity for that purpose until authorized to do so by *P. L. 1907 p. 96*, providing for the determination of title to riparian lands in which the state claims an estate, it was not barred by laches.

10. The government as a general rule is not barred by the laches of its officers.

11. Where the state in a proceeding under *P. L. 1907 p. 96* for a decree adjudging the invalidity of a grant made by the riparian commissioners to a railroad company under the alleged authority of *P. L. 1869 p. 1017*, tendered itself ready to submit to such terms as the court should establish by its decree, the defence of laches was not available.

---

*Mr. Chandler W. Riker, Mr. Bennet Van Syckel* and *Mr. Edmund Wilson,* attorney-general, for the informant.

*Mr. William H. Corbin, Mr. Charles L. Corbin* and *Mr. Richard V. Lindabury,* for the defendants.

STEVENS, V. C.

This is an information filed on behalf of the state, praying that a grant by the riparian commissioners to the Lehigh Valley Railroad Company of the state's interest in the "Basin of 1867" may be declared to have been obtained by false suggestion and to have been, for that and other reasons, *ultra vires* and void. This court is asked to set aside the conveyance on equitable terms.

In 1867 the legislature granted to the Morris Canal and Banking Company a basin adjacent to the terminus of its canal in the Hudson river. This basin is described by metes and bounds as lands under water, beginning at a point *in the river* in the southerly line of South street, extended seven hundred and sixty-five feet from the easterly line of Hudson street, in Jersey City. Speaking generally, its front on Hudson river is about nine hundred and sixty feet and its depth one thousand seven hundred and thirty-five feet, with a small additional parallelogram in the rear. The grant is made

"on condition that for the purpose of preserving a water basin to the west of the present westerly bulkhead on said premises and of leaving open on the premises hereby granted a public navigation for all vessels

to and from the Hudson river and all parts of the waters west of said westerly bulkhead, the said company shall forever keep open, the present gaps in the easterly and westerly bulkheads, each of one hundred and fifty feet in width and like gaps of like width in any structure to be erected on said premises hereby granted, so that the public may with all vessels freely navigate to and from the channel of the Hudson river, and all places east and west of said westerly bulkhead *without the payment of tolls or charges;* provided that the said opening shall be kept in such condition that the owners and occupants of shore property lying north and west of the above described property may at all times have free access to, as well as through, the same."

The second section of the act enacts that

"the Morris Canal and Banking Company may, *under the provisions of their charter,* construct piers, wharves, docks, basins, warehouses and other structures within the limits above described, and make reasonable rules and regulations for the use thereof, to enable them to carry on a transportation business in and over their canal and elsewhere, which they are hereby empowered to do and also to afford facilities for commerce."

The third section enacts that this act shall

"be in force during the continuance of the charter of the said Morris Canal and Banking Company and, at the expiration of that time, the lands hereby granted, with the improvements thereon, shall revert to the state on the same terms and conditions provided in the original charter of the said company respecting the transfer of the property thereof to the state." *P. L. 1867 p. 251.*

The charter of the company, passed on December 31st, 1824, in its twenty-fifth section provides

"that the said canal, when completed, *shall forever thereafter be esteemed a public highway, free* from the transportation of any goods, commodities or produce whatsoever, on payment of the tolls and conforming to the regulations made or authorized by this act."

In its twenty-sixth section the charter provides as follows:

"BE IT ENACTED, That at the end of ninety-nine years from the passing of this act, it shall and may be lawful for this state to take to itself and on its own account, the said canal and its appurtenances, paying to the said company the fair value thereof, to be estimated and fixed upon by ten commissioners or a majority of them, to be mutually chosen by this state and the said company; or in case that shall not

be done at that time or within one year thereafter, *this charter shall continue,* so far as respects its canal operations and privileges, for the further term of fifty years, when it shall cease and the said canal, with its appurtenances, become the sole property of this state."

In the leading case of *Gough* v. *Bell, 22 N. J. Law (2 Zab.) 441; S. C., 23 N. J. Law (3 Zab.) 624,* it was held that at common law the right of the owner of lands along the shore of navigable waters in which the tide ebbs and flows extended only to ordinary high-water mark, but that in New Jersey, by force of a local common law here prevailing, such an owner may extend his improvements, by wharves or filling up over the shore in front of his lands to low-water mark unless prevented by the state from so doing.

The question whether the owner of lands fronting on tidewater had such right of adjacency to the water, that the state could not, without making compensation, deprive him of it, by granting the lands under water in front of his lands and authorizing the improvement thereof, was left open. In *Stevens* v. *Paterson and Newark Railroad Co., 34 N. J. Law (5 Vr.) 532,* it was finally decided that he had no such right; that the state could grant such lands to anyone without compensation made to the shore owner.

*Gough* v. *Bell* was decided at the July term, 1850. In 1851 the legislature passed an act entitled "An act to authorize the owner of lands upon tidewater to build wharves in front of the same." By this act statutory form was given to the local custom and "the right of the shore owner was dealt with by the legislature, not as an incident of property already vested, but as a privilege which required the element of public acquiescence and the performance of a prerequisite on the side of the proprietor to be converted into a legal right." *34 N. J. Law (5 Vr.) 547.*

This continued to be the only general act on the subject until the year 1864. In that year the legislature passed an act entitled

"An act to ascertain the rights of the state and of the riparian owners in the lands lying under the waters of the bay of New York and elsewhere in the state."

This act provided for the appointment of a board of commissioners entrusted with the duty of causing the necessary surveys and examinations to be made by competent surveyors, of the lands lying under the bay of New York, the Hudson river and other waters and of ascertaining the present rights of the state in the same, and their value; and, in the language of the act,

"to fix and establish an exterior line in the said bays and rivers, beyond which no pier, wharf. bulkhead. erection or permanent obstruction of any kind shall be permitted to be made and to report to the next legislature."

The commissioners were appointed and reported, but the legislature did not act on their report until 1869. Then they passed the act on which the grant under attack is founded.

Its first section adopted the exterior bulkhead and pier lines fixed by the commissioners and shown on their maps so far as the Hudson river and New York bay were concerned, but with this very important reservation:

"Except said lines drawn on said maps over or upon lands within the boundaries of the grant made to the Morris Canal and Banking Company by act approved March 14th, 1867."

Section 2 enacts that

"it shall not be lawful to fill in with earth, stones or other solid material, in the tidewater of the Hudson river, New York bay and Kill von Kull beyond the bulkhead line or lines of solid filling by this act adopted. fixed and established."     *     *     *

Section 3 repeals the Wharf act as to the tidewaters of Hudson river, New York bay and Kill von Kull and then goes on to provide as follows:

"Neither this section nor any provision in this act contained shall in anywise repeal or impair any grant of land under water or right to reclaim made directly by legislative grant, or grant or license, power or authority so made or given, to purchase, fill up, occupy, possess and enjoy lands covered with water fronting and adjoining lands owned or authorized to be owned by the corporation, grantee, licensee in the legislative act mentioned, its, his or their representatives, grantee or assigns or to repeal or impair any grant or license, power or authority

to erect or build docks, wharves and piers opposite and adjoining lands owned or authorized to be owned by the corporation or grantee in the legislative act mentioned."    *    *    *

Sections 4 and 8 provide for grants to two different classes of persons—section 4 for the class mentioned in section 3, viz., those who already have a grant of lands under water or a license to reclaim or build docks, &c., given by prior legislative act, and section 8 for the class of persons who have no such grant or license.

Section 4 reads as follows:

"In case any person or corporation who by any legislative act is a grantee or licensee or has such power or authority or any of his, her or their representatives or assigns shall desire a paper capable of being acknowledged and recorded made by and in the name of the State of New Jersey conveying the land in the proviso to the third section mentioned whether under water now or not, and the benefit of an express covenant that the state will not make or give any grant or license, power or authority affecting lands under water in front of said lands, then and in either of such cases, such person or corporation, grantee or licensee, having such grant or license, power or authority his, her or their representatives or assigns, on producing a certified copy of such legislative act to said commissioners and, in case of a representative or assignee, also satisfactory evidence of his, her or their being such representative or assignee and requesting such grants and benefits as in this section mentioned, *shall be entitled* to said paper so capable of being acknowledged and recorded and granting the title and benefits aforesaid on payment of the consideration hereinafter mentioned; and the said commissioners or any two of them with the governor and attorney-general for the time being, to be shown by the governor signing the grant and the attorney-general attesting it, shall and may execute and deliver and acknowledge in the name and on behalf of the state, a lease in perpetuity to such grantee or licensee or corporation having such grant, license, power or authority, and to the heirs and assigns of such grantee or licensee or the successors and assigns of such corporation upon his, her or their securing to be paid to the state, an annual rental of three dollars for each and every lineal foot measuring on the bulkhead line, or a conveyance    *    *    *    in fee, upon his, her or their paying to the state fifty dollars for each and every lineal foot measuring on the bulkhead line, in front of the land included in said conveyance.    *    *    *    In case any person or corporation taking a lease under this section shall desire afterwards a conveyance of all or any part of the land so leased, the same shall be made upon payment of the said sum of fifty dollars for every such lineal foot as aforesaid of the land so desired to be conveyed; the conveyance or lease of the commissioners under this or any other section of this act shall not merely pass the title to the land therein described, but the right of the grantee or licensee, individual or corporation, his,

her or their heirs and assigns, *to exclude to the exterior bulkhead line the tidewater by filling in or otherwise improving the same and to appropriate the land to exclusive private uses,* and so far as the upland from time to time made, shall adjoin the navigable water, the said conveyance or lease shall vest in the grantee or licensee, individual or corporation and their heirs and assigns, the rights to the perquisite of wharfage and other like profits, tolls and charges."

Section 8 enacts

"that if any person or persons, corporation or corporations or associations shall desire to obtain a grant for lands under *water which have not been improved and are not authorized to be improved under any grant or license* protected by the provisions of this act, it shall be lawful for any two of the commissioners concurring, together with the governor and attorney-general of the state, upon application to them, to designate what lands under water for which a grant is desired lie within the exterior lines and to fix such price, reasonable compensation or annual rentals for so much of said lands as lie below high-water mark as are to be included in the grant or lease for which such application shall be made and to certify the boundaries and the price, compensation or annual rentals to be paid for the same under their hands; which shall be filed in the office of the secretary of state and upon the payment of such price, or compensation or annual rentals or securing the same to be paid to the treasurer of this state by such applicant, to apply to the commissioners for a conveyance assuring to the grantee, his or her heirs and assigns, if to an individual, or to its successors or assigns, if to a corporation, the land under water so described on said certificate * * * and upon delivery of such conveyance, the grantee may reclaim, improve and appropriate to his and their own use the lands contained and described in the said certificate, subject however to the regulations and provisions of the first and second sections of this act and such land shall thereupon vest in said applicant."

There is a proviso in this section that no grant or license shall be made to any other than a riparian proprietor until six calendar months after such proprietor shall have been notified and shall have neglected to apply for a grant or license himself.

There are marked differences between section 4 and section 8, and as the solution of the present controversy depends to some extent upon these differences, it will be necessary to consider them.

Three of the differences are fundamental. The first involves the character and qualifications of the applicant. Under section 4 he must have had a prior legislative grant of the lands in respect of which he desires "a paper capable of being acknowl-

edged and recorded," or a legislative license to reclaim and occupy them. Under section 8 he may be an entire stranger to the land.

The second difference consists in the mode of ascertaining the price. Under section 4 the price or rental is a specified sum, fixed in advance by the legislature itself; under section 8 it is left to the judgment of the commissioners. The reason is apparent. In cases coming under section 4 the legislature had already granted that which they either could not or did not wish to take away. Consequently the conveyance would operate as a deed of confirmation. For this confirmatory title, and for the covenant that the state would not make a grant in front of the lands, the legislature itself fixed the sum of $3 (rent) or $50 (purchase-money) for each lineal foot measured on the bulkhead line.

The third difference is that the person showing himself to be a prior statutory grantee or licensee under section 4 is entitled to demand the conveyance as a matter of right, not of favor; while in the class of cases coming under section 8 it is altogether discretionary with the state officers to give or withhold it.

The title to be vested under the conveyance appears to be the same in both cases, although the statutory language is more emphatic where it vests under section 4 than where it vests under section 8. Under section 4 the conveyance passes

"not merely the title to the land therein described (*i. e.*, the bare legal fee), but the right of the grantee or licensee * * * *to exclude to the exterior bulkhead line* the tidewater by filling in or otherwise improving the same and to *appropriate the land to exclusive private uses.*"

Under section 8 the effect of the grant is that "the grantee may reclaim, improve and appropriate to his and their own use, the lands contained and described in the said certificate."

In the case in hand the Lehigh Valley Railroad Company, on February 3d, 1888, made a written application under section 4. It sets forth that on March 14th, 1867, the legislature granted to the canal company a certain tract of land under water (designating the basin of 1867), which grant, it alleged, was within the purview of the third and fourth sections of the act of 1869—the

act whose provisions I have stated. It stated that it was the assignee of the canal company; that it desired a paper capable of being acknowledged and recorded conveying the land in the grant mentioned, in fee, with the benefit of an express covenant that the state would not make any grant affecting lands under water in front of said land. It tendered itself ready to pay to the state the sum of $50 for each and every foot measuring on the bulkhead line in front of the land so granted and it requested a conveyance.

It thus appears that the railroad company claimed, in its character of assignee of a prior legislative grant, to be entitled as a matter of right to a conveyance in fee, for the statutory price of $50 per lineal foot, measured on the bulkhead line. The commissioners so treated the application in their deed of conveyance; they recite the matters therein stated and then they say:

"AND WHEREAS, it appears to the said commissioners that the said Lehigh Valley Railroad Company has by virtue of the aforesaid grant from the State of New Jersey and of the lease from the Morris Canal and Banking Company and the performance of said conditions, such grant and license, power and authority as is in the said fourth section mentioned, *and is entitled to a paper* capable of being acknowledged and recorded and granting the title and benefits aforesaid." \* \* \*

The conveyance grants, conveys and confirms

"the said tract of land \* \* \* together with all the right and privilege of excluding the tidewater from said land *by filling in or otherwise improving the same and to appropriate the same to exclusive private use as fully to all intents* and purposes as the commissioners have power and authority to grant." &c.,

thus following the phraseology of the fourth and not of the eighth section of the act of 1869.

The question is whether the grant of the basin of 1867 was such a prior legislative grant as was contemplated by the terms of sections 3 and 4 of the act of 1869. It must be conceded that the legislature had itself already made a disposition of this particular tract and had devoted it to a public use. Had the commissioners power to release this use? I do not think they had. The legislative purpose was, I think, to authorize the commis-

sioners to cure and fortify a defective grant; not to change a perfect use.

Under the prior act of 1864, the commissioners prepared maps showing the bulkhead and pier lines in the Hudson river, and other localities whose adoption they recommended. These lines crossed the basin in question. But the legislature in adopting these maps and lines expressly excepted "said lines drawn on said maps over or upon lands within the boundaries of the grant made to the Morris Canal and Banking Company" by the act of March 14th, 1867. It left the basin without bulkhead lines in front of it, and there was, consequently, nothing by reference to which the commissioners could fix the price. The basin was not within the fourth section, because there was no way in which the price could be ascertained under that section, and it was not within the eighth section, because the eighth section applied, in terms, to lands which were neither improved nor authorized to be improved. Counsel for the defendants was, therefore, compelled to take the position that the exterior line of the basin of 1867 was itself a bulkhead line on which the commissioners could calculate the price. It is nowhere so designated, and it is not a bulkhead line in fact. In the various riparian acts the expression "bulkhead line" as used is synonymous with "line of solid filling." It is the line beyond which the upland cannot be extended; the ultimate boundary between land and water. But the exterior line of the basin of 1867 is no such line. The legislature, when it gave this property to the canal company, only authorized it to construct therein piers, wharves, docks, basins and similar structures, to enable it to carry on a transportation business. It did not authorize it to fill it up. It was to be used as a basin, in which might be built structures appropriate to its use as such. There were, at the time the grant was made, an interior basin, not granted, and two bulkheads considerably to the west of the exterior line of what was granted. In these bulkheads were gaps, and the legislative direction was that the gaps should be forever kept open, one hundred and fifty feet in width, so that the public might, with all vessels, freely navigate to and from the Hudson river and all places east and west of said westerly bulkhead, without the payment of tolls and charges. The scheme, therefore,

contemplated a waterway; a place where vessels might lie at anchor or be docked, loaded and unloaded; where they might pass from the river into an interior basin, and not an improvement bounded by an exterior line of solid filling. This shows why, when the legislature, in the act of 1869, adopted every other bulkhead line recommended by the commissioners, they excepted the lines drawn "within the boundaries of the grant made" to the canal company. As the price was an arbitrary price, fixed in advance by the legislature, to be calculated only on a bulkhead line, it necessarily follows that where that line was wanting, the calculation could not be made.

It is easy to see why the legislature should have wished to except the basin from the commissioners' power to grant. The business of the canal company was then in a prosperous condition. It, no doubt, wanted better terminal facilities, and so in 1867 it applied for and obtained a legislative grant. And by its charter it would cease to exist in 1974, and as its canal property would become the property of the state, without compensation, it was enacted that the basin property, with its improvements, should, at that time, become the property of the state "on the same terms and conditions provided in the original charter of the said company, respecting the transfer of the property thereof to the state." In other words, the canal, with its appurtenances, was to come to the state as a canal, and the basin, "with the improvements thereon," as a basin. Is it likely that the legislature in 1824, when it granted the charter, and in 1867, when it gave the basin, contemplated that immediately upon their acquisition or resumption by the state, the state would throw away the improvement and devote the property to other uses for which it was not fitted? In 1824 railroads were unknown. In 1867 they had not attained their present importance. Section 25 of the charter enacts that the canal, when completed,

"shall *forever* thereafter be esteemed a public highway, free for the transportation of goods on payment of tolls and conforming to the regulations of this act."

As the basin was made an adjunct to the canal to revert, "with its improvements," when the canal reverted, it seems to me that

in the absence of any legislative provision to the contrary, we must assume that the use for which alone these properties were adopted would continue, until the legislature saw fit to make some other disposition of them. This being so, why should we impute to the legislature a design to confer upon the commissioners a power to dispose of that which the legislature itself had already devoted, indefinitely, to the important public use of a basin, and when it had, in express terms, disabled the commissioners from fixing a price, in the only way in which they were authorized to fix a price for property thus circumstanced.

If the commissioners had power to convey, their conveyance must have operated in one of two ways. It either gave it to the Lehigh Valley Railroad Company absolutely, divested of *all* public use, or it conveyed to it the bare legal title, subject to the use that had been impressed upon it. I understand that counsel for the company, in his original brief, inclined to the former view, and in his reply brief to the latter. In this latter brief he says: "I think that in the argument that I am to refute there is a confusion of ideas; there is a failure to distinguish between the powers of the commission to convey and the powers of the grantee over the property after it has been conveyed. The power to convey is given by the riparian acts to be exercised under certain conditions; but the power of the grantee to use or dispose of the property is not made unlimited by conferring a title in fee-simple. The grantor reserves no title, but the charter and public duties of the grantee may control the use."

Counsel does not make it very plain whether by "grantee" he means the "canal company" or the "railroad company." It will hardly be contended that their uses are identical. If by "grantee" he means the railroad company, then his claim is that the commissioners could divest the use, so far as it was a canal or basin use, and grant it for a railroad use; but this necessarily means a complete power of disposition. If, on the other hand, by "grantee" he means the canal company, then his insistment is that the use to which the legislature had devoted the property continued, and the railroad company took nothing but the bare legal title, subject to the use. This latter view is entirely indefensible. If nothing but the bare legal fee passed, then the use continued, and

will continue indefinitely, and at the expiration of the term, the
grantee will hold in trust for the state or for the public—a singu-
lar and anomalous situation, not at all likely to have been in-
tended. This view is, moreover, quite at variance with the act
of 1869. Section 4 provides that the conveyance

"shall not merely pass the title to the land therein described, but the
right of the grantee or licensee, individual or corporation, his, her or
their heirs and assigns to exclude to the exterior bulkhead line the tide-
water by filling in or otherwise improving the same and tô appropriate
the land *to exclusive private uses.*"

If the legislature had anticipated such a contention and had
sought to exclude it they could not have done so by language
more emphatic. If this language means anything, it means that
the grantee shall, by the grant, acquire or be confirmed in a
present right to fill in up to the bulkhead line and a present
right immediately to appropriate the land to any use he may see
proper. It was on this unambiguous language that the supreme
court of the United States, in *Hoboken* v. *Pennsylvania Railroad
Co., 124 U. S. 656,* and this court in *M. & E. R. R. Co.* v. *Jer-
sey City, 63 N. J. Eq. (18 Dick.) 46; 71 N. J. Eq. (1 Buch.)
308,* held that the easement of a highway, over lands originally
under water granted by the commissioners, had been extin-
guished.

The question then comes back to this: Did the legislature
intend to give to the commissioners power to sell riparian lands
already devoted to a public use? If the legislature had devoted
land under water to the purposes of a public park, could the
commissioners have released the use because the legal fee con-
tinued in the state? If not, on what principle could they release
the basin from its use?

The law is well settled that a general affirmative statute does
not repeal a prior particular one, unless there is such an irrecon-
ciliable inconsistency between them as indicates an intention to
repeal. *Sedgw. Stat. & Const. L. 98; State* v. *Mills, 34 N. J.
Law (5 Vr.) 180; State* v. *Minton, 23 N. J. Law (3 Zab.) 529.*
Here, so far from there being any indication in the act of 1869
of an intention to authorize the commissioners to release the

property from the use imposed by the act of 1867, there is a strong indication to the contrary in the refusal of the legislature to adopt the bulkhead line recommended by the commissioners, thus disabling them from fixing a price.

I will now notice the particular grounds upon which counsel place themselves in contending for the validity of the grant.

It is first insisted that the charter of the canal company authorized a lease of the basin to the railroad company. It is plain that if the canal company had thereunder the power to lease or to assign its term, such lease or assignment would not extend beyond the year 1974. As by the act of 1871 the legislature undoubtedly gave it the power to lease, it will answer no useful purpose to inquire whether its charter also gave it the power.

It is next insisted that the act of 1871 gave the canal company the power to lease *"perpetually,"* and that having so leased, the right of the railroad company does not rest upon the commissioners' grant alone. This act (*P. L. 1871 p. 444*) provides that it shall be lawful for the canal company, with the consent of a majority in interest of its stockholders,

"to lease the canal of said company or any part thereof, with all or any of its boats, property, works, appurtenances and franchises to any person or persons, or corporation, either *perpetually* or for such shorter time and upon such rent and agreement as may be agreed upon between the said contracting parties, and it shall be lawful for the lessee or lessees in said lease to use and enjoy the said property and franchises so demised for the term in said lease mentioned."

That I may not misstate the argument of defendants on this point, I will quote the following extract from their printed brief. Counsel says: "No doubt can exist that if the canal company had the power to lease the premises and the canal for a longer term than 1974, they exercised that power; in clear terms, they leased all their real property perpetually, and in so doing named property which they owned for a term of years only. If the lease is valid as a perpetual lease it is so because the state by the act of 1871 has authorized it and thereby parted with its reversion in favor of the lessee. That act in clear terms not only empowered the canal company to lease the canal property and

franchises perpetually but expressly provided that it shall be lawful for the lessee to enjoy the said property and franchises so demised for the term of said lessee mentioned."

There is no indication in the act of 1871, outside of the single word "perpetually," that the legislature intended to give either the canal company or the railroad company any property or franchise that they did not have before, and yet the contention is that by the use of that word alone, the legislature intended to give up not only its reversionary interest in the basin but in the canal property as well; and not only this, but to extend the franchises of the Morris canal in favor of the Lehigh Valley Railroad perpetually, although by the terms of its charter those franchises were to come to an end in 1974. The only authority to lease the basin is found in the authority to lease the property, works and appurtenances of the canal. The basin is not specially mentioned; the canal is; and, therefore, any authority to lease the basin applies still more obviously to the canal. It is little short of absurd to suppose that the legislature intended, by the use of the word under consideration, to confer, first, a perpetual franchise, and then to surrender the valuable rights that it had on two previous occasions been so careful to preserve. It is easy to construe the language used so as to conform to the evident intent of the legislature. What the canal company possessed, that it might lease, perpetually, in so far as it had the absolute title, and for a shorter period, in so far as its title was circumscribed. What the statute authorized was a lease of the canal company's property, not the state's. The case seems to me to be a very obvious application of the rule *reddendi singula, singulis.* Nothing is better settled than that the state is not presumed to have parted with any part of its property, in the absence of conclusive proof of an intention to do so. *Stevens* v. *Paterson and Newark Railroad Co.,* *34 N. J. Law* (*5 Vr.*) *532, 533; Martin* v. *Waddell, 16 Pet. 411; Polhemus* v. *Bateman, 60 N. J. Law* (*31 Vr.*) *163.* "Any ambiguity must operate against the grantee and in favor of the public." *United States* v. *Michigan, 190 U. S. 401.*

If the contention had been that the statute gave a power to lease for the benefit of the canal company up to 1974, and there-

after for the benefit of the state, it would have been more plausible; but had such been the intention, we would have expected to find some provision guarding the state's interests in the matter of rents to be reserved. Counsel, however, does not contend for such a construction of the act, and, in point of fact, no attempt was made by either company, in the lease as executed, to guard the interests of the state in this or any way. It would have been open to 'the same objections, though in less glaring form, that the other construction was open to.

Counsel's next insistment is that if the act of 1869 did not give the riparian commissioners power to convey the basin property, the act of 1874 did. *Gen. Stat. p. 2791.* This act provides that from and after its passage

"it shall be lawful for the riparian commissioners or any three of them therein concurring, together with the governor of this state, to fix and determine, within the limits prescribed by law, the price or purchase-money, or annual rental to be paid by any applicant for so much of the lands below high-water mark, or lands formerly under tidewater belonging to this state, as may be described in any application therefor duly made according to law."

For lands so applied for, the commissioners, with the governor's approval, may make a grant or lease.

It has been already shown that the act of 1869 provides for two distinct classes of cases. First, the class in which there had been a prior legislative grant or a prior legislative license to reclaim—that in which the legislature had itself fixed the price or rental to be paid. Second, the class in which there had been neither improvement of the state's land nor authorization to improve. This latter was the class in which the legislature had authorized the commissioners to fix the price or rental. Whether the act of 1874 applies to lands of the first class may be doubtful. The act says the commissioners may fix the price "within the limits prescribed by law." Does this mean that they may fix it, except in cases where the legislature has already fixed it? It is not, and in the present case could not be, suggested that the act of 1874 had altogether superseded the fourth section of the act of 1869; and so, if the two methods of ascertaining the price co-exist, the practical result would be that in cases where the

applicant thought he could secure a grant for less than the
statutory price, he would apply under the act of 1874; and
where he thought he could not, he would apply under the act
of 1869. I do not feel called upon to decide this question, for,
assuming that the railroad company could have secured a grant
under the act of 1874, it did not apply under that act, but under
the act of 1869.

The defendant, however, relies upon what was said by Justice
Dixon in *Elizabeth* v. *Central Railroad Co., 53 N. J. Law (24
Vr.) 491,* viz.: "Although the act of March 21st, 1871, alone
is mentioned in the deed, it is not referred to as the only source
of authority for the grant. On the contrary, the grant is made
in absolute terms, independent of any riparian title and with-
out reference to any particular statute; consequently, it must
be deemed as comprehensive as the law permitted." This de-
cision is not applicable. It had to deal only with legislative
acts which gave the commissioners power to fix the price—acts
therefore in *pari materia*. There, too, the act of 1871 was not
referred to as the *only* source of authority; here, section 4 of
the act of 1869 is so referred to. The deed recites that the
railroad company "has made application in writing requesting
such grant and benefit as are *mentioned in said fourth section;*"
that it has, by virtue of the grant of the basin to the canal com-
pany and of the lease of the basin from that company to it,
"such grant and license, power and authority *as in the said
fourth section mentioned,*" and that the consideration is the sum
of forty-eight thousand dollars, being fifty dollars for each lineal
foot, *measuring on the bulkhead line."* No such recitals are
applicable or proper in the case of a grant made under the act
of 1874. Moreover, the attorney-general joins in the grant to
the railroad company, as he is required to do by the act of 1869,
but not by the act of 1874.

The claim as made was that the railroad company was, *as a
matter of right,* entitled to have a conveyance of this very valu-
able water front for the price of $50 per lineal foot, and to this
the commissioners acceded. It is hardly probable that if they
had supposed that they had any discretion as to price, they
would have made a conveyance for so small a sum. But if it

could be said that the deed in question was not made with reference to any particular statute, still as it seems to me the prior grant to the Morris canal, and its devotion indefinitely to the public use of a basin took it out of the class of property to which the act of 1874 refers. The lands "belonging to the state" were those not already devoted to some public use. This phase of the matter has already been considered.

I now come to the question of laches and estoppel. The argument is that since 1889 the state has stood by and allowed the Lehigh Valley railroad to make various improvements in the basin without objection. These improvements consist mainly of wharves or piers, suitable to a basin property, and such as were authorized by the lease made by the Morris Canal Company. It does not appear that these wooden structures are likely to last beyond that time unless renewed.

On this branch of the case it is important to remember that the question is one of *legal* title. The information is filed under the act of 1907 (*P. L. 1907 p. 96*), entitled

"An act to compel the determination of titles to riparian lands and lands under water in which the state claims an estate in remainder or reversion and to quiet the title to the same."

It is quite similar in its provisions and object to the act entitled "An act to compel the determination of claims to estates in remainder in certain cases and to quiet the title to the same," considered and upheld in *Haley* v. *Goodheart, 58 N. J. Eq. (13 Dick.) 368; 72 N. J. Eq. (2 Buch.) 953.* Its rationale is that, ordinarily, this court has no jurisdiction to pass upon legal titles, but that where the case is so circumstanced that no immediate relief can be given by action at law, it is within the competence of the legislature to give a remedy in this court. The legislature has, by the act of 1907, given such a remedy in the class of cases in which the present case is included. What this court is called upon to do, therefore, is to determine a legal question according to the legal rules that would be applied in the supreme court in case the term of years given to the canal company had come to an end and an action of ejectment had been brought. If this court had to pass upon a question of

equitable relief to which informant claimed to be entitled, such a question as was presented in *Attorney-General* v. *Central Railroad Co., 68 N. J. Eq. (2 Robb.)* 198, then the equitable rules governing such relief and referred to by Vice-Chancellor Emery in his opinion might be invoked. But the state stands on its legal rights. It is the defendants who resort to equity as a defence. The question is, have they been able to show such an equity as will prevail over the legal title? The burden of proof is on them. The state has not been in laches in bringing this action, for not being entitled to the possession until 1974 it could not have brought an action to test the legal title in the law courts, and it could not have brought such an action in this court until it was authorized to do so by the act of 1907. It is said that it has stood by and has seen the Lehigh Valley Railroad Company make improvements without any assertion of its rights, but there is little or nothing to show that the company would not have made the same improvements had it had nothing more than its lease. The improvements themselves may not outlast the term. It appears from the evidence of Mr. Hocke, the engineer in charge of the work, that he made a plan of the improvement in the basin and on the adjoining property in the early part of 1888. Work was extensively prosecuted in that year and the next. The grant was applied for on February 3d, 1888. The deed of conveyance bears date on July 12th, 1889, but did not receive the governor's approval until December 20th, 1889, and the price ($48,000) was not paid until the approval was given. In 1888 there was expended $385,808; in 1889, $262,456.22. The total cost of the improvement was $878,898.40. It thus appears that $658,000, or nearly three-quarters of the entire amount, was spent while the railroad company had no other title than its lease from the canal company, made in 1871. It is impossible for the company, therefore, to assert that the improvement was made in reliance upon the commissioners' title. It is more obviously referable to its lease, which had still, in 1888, eighty-six years to run. The general rule is that the government is not barred by the laches of its officers. *United States* v. *Kirkpatrick, 9 Wheat. (U. S.)* 720; *United States* v. *Beebe,*

*180 U. S. 342; United States* v. *Michigan, 190 U. S. 405.* But recourse to this rule is hardly necessary, for it is not shown that the same improvements would not have been made in the same way under the leasehold title.

Furthermore, to quote the words of Chief-Justice Depue in *American Dock Co.* v. *Trustee, 35 N. J. Eq. (8 Stew.) 183,* "the equity of a party who relies on an equitable estoppel to give validity to an inefficient contract is not to have his contract made binding, but to put his adversary to an election between the performance of the contract and the repudiation of it on equitable terms." Here the state tenders itself ready to submit to such terms as the court shall establish by its decree. It should refund the purchase-money with interest. If the fee has been taxed on any different basis from that on which the term would be taxed, it should refund the difference. I do not find in the evidence any warrant for compelling the state to pay for any part of the improvement, as it is an improvement similar to that contemplated by the act of 1867, and as it does not appear that it would not have been made under the lease. The railroad has the benefit of it until 1974.